# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOAN FOX, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 12 CV 5124 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| REGIONAL TRANSPORTATION ) | |
| AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Joan Fox and Nick Farina bring this action on behalf of themselves and all similarly situated individuals against the Illinois Regional Transportation Authority (RTA), the Commuter Rail Board, and the Northeast Illinois Regional Commuter Railroad Corporation (the latter two defendants sometimes do business under the name "Metra" and, for simplicity, the court will refer to all defendants by that name). Plaintiffs allege that Metra violated a provision of the Federal Transit Act, 49 U.S.C. § 5307(c)(1)(D), that conditions a transportation operator's federal funding on the operator's agreement not to charge certain people (seniors, disabled passengers, and Medicare recipients) more than half of the "peak-hour" fare during "non-peak" hours. Plaintiffs bring three claims: (1) a federal claim under 42 U.S.C. § 1983 alleging a violation of § 5307(c)(1)(D); (2) a state-law claim for restitution, and (3) a state-law claim for breach of contract. Metra moves for summary judgment, arguing, among other things, that plaintiffs' federal claim must be dismissed because § 5307(c)(1)(D) does not contain a private right of action. For the reasons explained below, Metra's motion is granted.

# I. BACKGROUND

**A. 49 U.S.C. § 5307(c)(1)(D)**

As an operator of public transportation in the Chicago metropolitan area, Metra receives federal funds pursuant to the Federal Transit Act, 49 U.S.C. §§ 5301-5340. Section 5307(c)(1)(D) of the Act conditions a transportation operator's receipt of federal funds as follows:

> **(c) Grant recipient requirements.**--A recipient may receive a grant in a fiscal year only if--
>
> (1) the recipient . . . submits . . . a certification for that fiscal year that the recipient . . .
>
> . . .
>
> (D) will ensure that, during non-peak hours for transportation using or involving a facility or equipment of a project financed under this section, a fare that is not more than 50 percent of the peak hour fare will be charged for any--
>
> (i) senior;
>
> (ii) individual who, because of illness, injury, age, congenital malfunction, or other incapacity or temporary or permanent disability . . . , cannot use a public transportation service or a public transportation facility effectively without special facilities, planning, or design; and
>
> (iii) individual presenting a Medicare card . . . .

49 U.S.C. § 5307(c)(1)(D) (the court will refer to this provision as the "half-fare provision").

Section 5307(f) provides for a triennial review whereby the Secretary of Transportation "shall review and evaluate . . . the extent to which [a recipient's] program activities are consistent with the activities proposed under subsection (c) [including the half-fare provision] . . . ." 49 U.S.C. § 5307(f)(2). If the Secretary's review reveals deficiencies in a transportation operator's compliance with the half-fare provision, § 5307 authorizes the Secretary to "take appropriate action . . . including making an appropriate adjustment in the amount of a grant or withdrawing the grant." 49 U.S.C. § 5307(f)(3). The Secretary is also empowered under the Act to "sue, to "enforce a right conferred on the Secretary by law or

2

agreement," and to "issue regulations as necessary to carry out the purposes of [the Act]." 49 U.S.C. §§ 5334(a)(2), (3), (11).

The Secretary of Transportation has promulgated regulations implementing § 5307(c)(1)(D). Section 609.23 of title 49 of the Code of Federal Regulations, titled "Reduced Fare," states:

> Applicants for financial assistance under section 5307 of the Federal transit laws . . . must, as a condition to receiving such assistance, give satisfactory assurances . . . that the rates charged elderly and handicapped persons during non-peak hours for transportation . . . will not exceed one-half of the rates generally applicable to other persons at peak hours . . . .

49 C.F.R. § 609.23.

**B. Plaintiffs' Claims**

Plaintiffs Joan Fox and Nick Farina are seniors who allege that they purchased Metra monthly or ten-ride passes and paid fares that exceeded 50 percent of the highest fares charged to other riders who purchased the same passes. They allege that Metra violated 49 U.S.C. § 5307(c)(1)(D) and 49 C.F.R. § 609.23 by "charg[ing] and collect[ing] . . . fares [from] Plaintiffs . . . [that] were higher . . . than the . . . [amount] mandated . . . [by] § 5307(c)(1)(D) . . . ." (Compl. ¶ 34, ECF No. 57.) They bring a federal claim under 42 U.S.C. § 1983, alleging that Metra deprived them of rights secured to them by § 5307(c)(1)(D). They also bring state-law claims for restitution and breach of contract.

Metra argues that (1) there is no private right of action under § 5307(c)(1)(D); (2) even if there were a private right of action, § 5307(c)(1)(D) does not apply to monthly pass or ten-ride tickets; (3) in any event, Metra did not charge more than half-fare; (4) plaintiffs' breach of contract claim fails because the tickets were not contracts; (5) a five-year statute of limitations bars any claims based on tickets purchased more than five years from the filing of this action; and (6) RTA is not a proper defendant.

3

The court has original jurisdiction over plaintiffs' federal claim under 28 U.S.C. §§ 1331 and 1343(a)(3). The court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

### A. Count I (Violation of § 5307(c)(1)(D) through § 1983)

Metra argues that Count I must be dismissed because there is no private right of action under § 5307(c)(1)(D) and so plaintiffs may not sue to enforce § 5307(c)(1)(D) through § 1983.

In *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court discussed the circumstances under which a statutory violation may be enforced through § 1983. The plaintiff in *Gonzaga* sought to sue his university to enforce provisions of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232(g) (FERPA), which "prohibit[ed] the federal funding of educational institutions that ha[d] a policy or practice of releasing education records to unauthorized persons." 556 U.S. at 276. Specifically, FERPA provided that:

4

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization.

20 U.S.C. § 1232(g)(b)(1). FERPA further provided that the Secretary of Education could terminate a university's funding if the Secretary determined that the institution failed to comply with FERPA's requirements. *Id.* § 1234c(a).

The *Gonzaga* Court held that, in considering whether a plaintiff may sue under § 1983, the critical inquiry is whether Congress "intended to create a federal right." *Gonzaga*, 536 U.S. at 283. "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286. The Court stated that its implied right of action cases "should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* at 283.

In determining whether FERPA conferred individual rights, the Court noted that it had "never before held . . . that spending legislation drafted in terms resembling those of FERPA can confer enforceable rights." *Gonzaga*, 536 U.S. at 279. "'In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" *Id.* at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). The Court noted that FERPA's nondisclosure provisions lacked the sort of "rights-creating" language "critical to showing the requisite congressional intent to create new rights":

> Unlike the individually focused terminology of Titles VI and IX ("No person . . . shall . . . be subject to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice."

20 U.S.C. § 1232g(b)(1). This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "individual entitlement" that is enforceable under § 1983.

*Gonzaga*, 536 U.S. at 287 (quoting *Blessing v. Freestone*, 529 U.S. 329, 343 (1997)). "In sum, . . . FERPA's nondisclosure provisions contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions. They therefore create no rights enforceable under § 1983." *Gonzaga*, 536 U.S. at 290.

The Seventh Circuit elaborated on the test for determining whether a statute contains rights enforceable under § 1983 in *Indiana Protection & Advocacy Services v. Indiana Family & Social Services Administration*, 603 F.3d 365 (7th Cir. 2010) (*en banc*). There, the plaintiff sought to enforce, through § 1983, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (PAIMI). *Ind. Prot. & Advocacy Servs.*, 603 F.3d at 367. PAIMI provided funding for states on the condition that they designate a "system" to "protect and advocate the rights of [individuals with mental illnesses]." *See id.* PAIMI gave such systems authority to investigate incidents of abuse and neglect of individuals with mental illness. *Id.* Specifically, PAIMI mandated that such systems "shall . . . have access to all records of any individual who is a client of the system if such individual . . . has authorized the system to have such access." 42 U.S.C. § 10805(a)(4)(A).

The designated "system" in Indiana, the Indiana Protection and Advocacy Services (IPAS), sued state officials under § 1983 to give IPAS access to records of two mentally ill patients in a state hospital. *Id.* at 367. The defendants argued that the only relief from Indiana's violations of the PAIMI Act would be for the federal government to cut off funding for IPAS itself. *Id.* at 374.

The court rejected defendants' argument and held that PAIMI authorized IPAS to bring suit against the state officials. *Id.* In reaching this conclusion, the court emphasized that Congress had phrased PAIMI "in terms that grant rights to the protection and advocacy systems in each state." *Id.* at 275 (citing 42 U.S.C. § 10805(a) ("A system . . . shall—. . . (3) have access to facilities . . . ; (4) . . . have access to all records of . . . .")). The court also noted that PAIMI's exhaustion provision contemplated the possibility that protection and advocacy systems could sue to enforce PAIMI in federal court. *Id.* at 375-76. In response to the defendants' argument that PAIMI was merely an exercise of Congress's spending power to condition the receipt of specified federal funds on compliance with specified terms, the court noted that "the remedy of a funding cut-off for violations of the Act would be perversely counterproductive." *Id.* at 380; *see also id.* at 383 (Posner, J., concurring) ("[T]hat . . . would be cutting off one's nose to spite one's face."). Thus, the court held that IPAS could bring suit against state officials under § 1983.

Against this backdrop, the court now turns to the statute at issue in this case—the Federal Transit Act—which was formerly called the Urban Mass Transportation Act (the UMT Act). Although the question of whether § 5307(c)(1)(D) of the Federal Transit Act creates a private right of action appears to be a question of first impression, several courts have held that, as a general matter, the Federal Transit Act creates neither an express nor an implied private right of action. *See City of Evanston v. Reg'l Transp. Auth.*, 825 F.2d 1121, 1123 (7th Cir. 1987) (per curiam) ("The UMT Act does not create a private right of action, and none can be implied."); *Lloyd v. Ill. Reg'l Transp. Auth.*, 548 F. Supp. 575, 586 (N.D. Ill. 1982) ("There is no language either in the [UMT] Act or its legislative history indicating an intent to create a private action on behalf of elderly or handicapped users."); *Blue Bird Coach Lines, Inc. v. Linton*, 48 F. Supp. 2d

7

47, 49 (D.D.C. 1999) ("The FT[] Act does not create a private right of action, and none can be implied.").

In *City of Evanston*, the Seventh Circuit considered a challenge to the RTA's use of certain property as a bus maintenance facility. 825 F.2d at 1122. The plaintiff relied on Section 1602(d) of the UMT Act, which required that an applicant for a federal grant certify that it had provided notice and an opportunity for public hearings and held such hearings, "unless no one with a significant economic social, or environmental interest in the matter requests a hearing." 49 U.S.C. § 1602(d)(1). The applicant was also required to certify that it had considered the economic, social, and environmental impacts of the project and found that the project comports with official development plans. 49 U.S.C. §§ 1602(d)(2), (3). The court held that "[t]his language does not create rights for a benefitted class of persons; it simply outlines information that an applicant must supply to the Secretary of Transportation as a condition to receiving a grant or loan." *City of Evanston*, 825 F.2d at 1124. The court agreed with the "several courts" that had concluded that:

> [N]either the language nor the legislative history of the UMT Act suggests that the Act was intended to create federal rights for especial benefit of a class of persons but rather was intended to benefit the public at large through a general regulatory scheme to be administered by the Secretary of Transportation.

*Id.* at 1124 (quoting *Lloyd*, 548 F. Supp. at 586). Thus, the court held that plaintiffs could not proceed under the UMT Act.

In *Lloyd*, the plaintiffs, representing a class of disabled passengers, challenged RTA's compliance with UMT Act requirements that disabled passengers have access to the mass transportation system in the Chicago metropolitan area. *Lloyd*, 548 F. Supp. at 578. Regulations promulgated pursuant to the UMT Act required, among other things, that "each mode of public transportation . . . be accessible to the handicapped." *Id.* at 580. The plaintiffs alleged that

defendants "failed to implement . . . annual elements, which contained transportation improvement programs for the handicapped . . . [;] failed to implement any . . . special projects for the handicapped . . . [;] failed to spend a vast majority of the funds allocated for projects to benefit the handicapped . . . [;] and . . . purported to satisfy . . . regulatory requirements . . . by carrying over projects that had been proposed but not implemented." *Id.* at 581-82.

In considering whether the UMT Act provided plaintiffs with a private right of action, the court acknowledged that "[t]he language of the statute makes it clear that it was enacted for the benefit of the handicapped and elderly in the use of mass transportation" and that the plaintiffs were members of the "class for whose especial benefit the statute was enacted." *Id.* at 585. The court further acknowledged that:

> Section 16 [of the UMT Act] declares a national policy that elderly and handicapped persons have the same right as others to use mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transit facilities in order to make them accessible to the elderly and the handicapped; and that all federal programs offering assistance in mass transportation should contain provisions implementing that policy . . . . Further, § 16 authorizes the Secretary of Transportation to make grants and loans to local and state agencies in order to assist them in providing mass transportation services to the elderly and handicapped.

*Id.* at 585-86. But the court noted that although the plaintiffs were clearly members of the benefitted class, "that factor alone does not end the inquiry," as "the focus must be on 'the intent of Congress.'" *Id.* at 585 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377 (1982)). And in considering the intent of Congress, the court held that "[t]he legislative history of the UMT Act provides no indication, explicit or implicit, of an intent to create or to deny a private cause of action in favor of the Act's beneficiaries." *Id.* at 586. Thus, the court concluded that plaintiffs could not proceed under the UMT Act.

In this case, as was true in *Lloyd*, it is apparent from the text of § 5307(c)(1)(D) that Congress intended the provision to benefit elderly and disabled riders of mass transit facilities. But as the *Lloyd* court acknowledged, and as the *Gonzaga* court made clear, that "does not end the inquiry." *Lloyd*, 548 F. Supp. at 585. Aside from the fact that § 5307(c)(1)(D) specifically identifies the class of individuals who will benefit from the half-fare provision, none of the other indicia of congressional intent to create a private right of action are present in § 5307(c)(1)(D).

First, the provision was enacted pursuant to Congress's spending power. Second, it lacks the "individually focused terminology of Titles VI and IX ('No person . . . shall . . . be subject to discrimination') . . . ." *Gonzaga*, 536 U.S. at 287; *see also Ind. Prot. & Advocacy Servs.*, 603 F.3d at 367 ("[T]he Act requires that IPAS 'shall . . . have access to all records . . . .'"). Third, the provision speaks to the Secretary of Transportation, who is "two steps removed from the interests" of the individuals benefitted by § 5307(c)(1)(D). *Id.* And fourth, Congress expressly authorized the Secretary of Transportation to "take appropriate action . . . including making an appropriate adjustment in the amount of a grant or withdrawing the grant, "sue," "enforce a right conferred on the Secretary by law or agreement," and "issue regulations as necessary to carry out the purposes of [the Act]." 49 U.S.C. §§ 5307(f)(3) & 5334(a)(2), (3), (11). All of this suggests that § 5307(c)(1)(D) was not intended to "confer the sort of individual entitlement that is enforceable under § 1983." *Gonzaga*, 536 U.S. at 275; *accord Westchester Cnty. v. Koch*, 438 N.Y.S.2d 951, 954 (Sup. Ct. 1981) (holding that no private right of action existed under the UMT Act's half-fare provision), *aff'd*, 450 N.Y.S.2d 388 (App. Div. 1982).

Plaintiffs offer nothing to upset this analysis. They identify nothing in the Federal Transit Act or its legislative history suggesting a congressional intent to create a private right of action. They do not distinguish in any meaningful way the cases discussed above. Instead, they

simply assert that "[§ 5307], as plead[ed] in Plaintiffs' Complaint in conjunction with § 1983, provides Plaintiffs and putative Class standing and a basis for their causes of action, without the need to pursue an actual or implied private right of action." (ECF No. 111, at 3.) They argue that "Section 1983, accompanied by § 5307 *et seq.*, creates a right for a plaintiff to sue . . . which is completely distinct to a 'right of private action' or an 'implied right of private action.'" (*Id.* at 4.)

These arguments, however, are directly contrary to *Gonzaga*'s teaching that "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." 536 U.S. at 290; *see also id.* at 285 ("[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.") (internal quotation marks omitted).

Plaintiffs also cite *Westchester* for the proposition that "Congress intended subdivision (m) of section 1604 [of the UMT Act] to benefit elderly and handicapped riders of mass transit facilities" and argue that *Westchester* "supports the fact that 49 USC § 5307 . . . is also a statute phrased 'with an unmistakable focus on the benefitted class' as required by *Gonzaga* . . . ." (ECF No. 111, at 6.) But the *holding* of *Westchester* was that the UMT Act did *not* contain a private right of action, notwithstanding the fact that Congress intended § 1604 "to benefit elderly and handicapped riders." 438 N.Y.S.2d at 954.

Plaintiffs also stress the fact that § 5307(c)(1)(D) specifically identifies the individuals protected by the provision. But, as discussed above, that is only one of the factors that the court must consider. The other aspects of the § 5307(c)(1)(D) identified by the court strongly suggest that Congress did not intend to allow private individuals to sue to enforce its provisions.

11

For these reasons, the court finds that Congress did not intend § 5307(c)(1)(D) to confer plaintiffs with individual rights. Thus, plaintiffs' claims fail as a matter of law. Accordingly, Metra's motion for summary judgment on Count I is granted.

## B. Counts II and III (State-law claims for restitution and breach of contract)

Metra argues that if the court dismisses the federal claim in Count I, the court should also dismiss the state-law claims in Counts II and III because they "also hinge on a private right to enforce the half-fare provision." (ECF No. 70, at 12.) Before addressing the merits of the state-law claims, however, the court must first consider whether it is appropriate to do so in light of the fact that the court has already dismissed the one claim over which it has original jurisdiction. The court has jurisdiction over the state-law claims only under the supplemental-jurisdiction statute, 28 U.S.C. § 1367. Under § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over a state-law claim if "the district court has dismissed all claims over which it has original jurisdiction."

It is the "well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). "[A] district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). "While there are unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point to federal decision of state-law claims on the merits, the district judge is given broad power in determining whether such circumstances apply and thus whether it is appropriate to retain jurisdiction over the state law claims." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140

F.3d 716, 727-28 (7th Cir. 1998) (internal quotation marks omitted). Where the court declines to exercise supplemental jurisdiction, that decision is "almost unreviewable, especially when all federal claims have been dropped from the case before trial and only state law claims remain." *Id.* (internal quotation marks omitted). "At that point, respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Id.* (internal quotation marks omitted).

This case is not the "unusual" one where the factors of judicial economy, convenience, fairness and comity counsel in favor of retaining jurisdiction. First, judicial economy would not be served by this court's retention of jurisdiction. The court's resolution of the federal claim involved a pure question of federal law. The state-law claims for restitution and breach of contract, by contrast, involve distinct questions of state law. For example, Metra argues that the breach of contract claim fails because, under Illinois law, there is no "contractual relationship between passenger and carrier . . . until the passenger has presented herself at the proper place to be transported with the intention of becoming a passenger and is then . . . accepted by the carrier for transportation." (ECF No. 70, at 16.) But the court's analysis of whether § 5307(c)(1)(D) confers plaintiffs with an individual right is irrelevant to the question of whether there was a contractual relationship between plaintiffs and Metra. Similarly, Metra argues that the restitution claim should be dismissed because it "also hinge[s] on a private right to enforce the half-fare provision." (ECF No. 70, at 12.) But under Illinois law, to establish a claim for unjust enrichment (*i.e.*, restitution), a plaintiff must show only that (1) the defendant has unjustly retained a benefit to the plaintiff's detriment and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 834 (N.D. Ill. 2009) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon*

13

*Hosp., Inc.*, 545 N.E.2d 672, 674 (Ill. 1989)), *aff'd*, 612 F.3d 932 (7th Cir. 2010). Whether § 5307(c)(1)(D) confers plaintiffs with an individual right does not answer these questions. Thus, there would not be a substantial judicial economy were this court to preside over the state-law claims.

Second, convenience would not be served by this court's retention of jurisdiction. Although federal courts may retain jurisdiction to dismiss state-law claims where the claims are "patently frivolous," *see Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997), it is not "absolutely clear to this court how the supplemental law claims will be decided." *Mooney v. Nw. Ill. Reg'l Commuter R.R. Corp.*, 128 F. Supp. 2d 1178, 1181 (N.D. Ill. 2001). As discussed above, the claims turn on questions of state law that the court's resolution of the § 1983 claim does not answer.

Third, fairness and comity would not be served by this court's retention of jurisdiction. In considering whether retaining jurisdiction would be "unfair" to the parties, courts consider factors such as whether there is some reason plaintiffs would not be able to present their claims in state court. *See Mooney*, 128 F. Supp. 2d at 1182. The court is unaware of any such reasons existing in this case. Furthermore, comity concerns strongly support declining to exercise supplemental jurisdiction over the state-law claims. Whether plaintiffs will prevail on their state-law claims involve questions of Illinois law that Illinois courts have greater expertise in and a greater interest in applying.

For these reasons, the court declines to exercise supplemental jurisdiction over the state-law claims. The court dismisses the state-law claims (Counts II and III) without prejudice.

## IV. CONCLUSION

For the foregoing reasons, Metra's motion for summary judgment on Count I is granted. The court declines to exercise supplemental jurisdiction over Counts II and III, and those counts are dismissed without prejudice. The clerk is respectfully directed to terminate this case.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 23, 2014